*408 OPINION OF THE COURT
Cassandra M. Mullen, J.
Procedural Background
On February 1, 2008, this court concluded a hearing to determine whether there is probable cause to believe that respondent, Derrick Brooks, is a sex offender requiring civil management pursuant to article 10 of the Mental Hygiene Law. (Mental Hygiene Law § 10.06 [g].) A sex offender requiring civil management is a detained sex offender who suffers from a mental abnormality. (Mental Hygiene Law § 10.03 [q].)
If respondent is found to be a sex offender requiring civil management, it is suggested that further findings should be made to determine whether there is probable cause to believe that he is “sufficiently dangerous to require confinement . . . during pendency of the [article 10] proceedings” and whether lesser conditions of supervision will not suffice to protect the public during this time. (Mental Hygiene Legal Serv. v Spitzer, 2007 WL 4115936, *15, 2007 US Dist LEXIS 85163, *54 [SD NY 2007]; see generally Matter of State of New York v O.V., 18 Misc 3d 917 [2008].)
Respondent, 37 years old, was eligible for conditional release to parole supervision on December 9, 2007. He had been convicted of sexual abuse in the first degree by forcible compulsion in 1993 and in 2004. On November 23, 2007, a report was prepared by the case review team of the New York State Office of Mental Health recommending that respondent be evaluated by a psychiatrist to determine whether he is a sex offender with a mental abnormality requiring civil management. On December 5, 2007, Christine Rackley, Ph.D., examined respondent and concluded that he suffers from a mental abnormality and is at high risk to commit sex offenses.
A civil management petition was filed on December 6, 2007 and served on respondent. On December 19, 2007, this matter was transferred to Kings County Supreme Court, Criminal Term, for all purposes.
Probable Cause Hearing
The “probable cause” standard to be used in article 10 (the definition of which has been litigated by both sides in other article 10 proceedings) has been defined by numerous courts over the years. The Legislature did not specify a different probable cause standard when creating this article. Therefore, simply *409 stated, probable cause is reasonable cause to believe that a respondent has a mental abnormality. Probable cause includes the commonsense practical and factual considerations arising from a synthesis of all information put before the court, including expert opinions by the petitioner, which may or may not result in the determination that it is more probable than not that a respondent suffers from a mental abnormality. (See generally People v Bandera, 204 AD2d 340 [1994], Iv denied 83 NY2d 1002 [1994]; People v Davis, 192 AD2d 360, 361 [1993], Iv denied 81 NY2d 1071 [1993].)
Petitioner called one witness, Dr. Christine Rackley, a licensed forensic psychologist for the New York State Office of Mental Health. After being duly qualified as an expert, counsel for respondent objected to the introduction of her testimony because he was not present for her pre-petition interview. This court admitted Dr. Rackley’s testimony based upon Mental Hygiene Law § 10.08 (g), which does not provide for counsel when an individual is asked by the case review team to submit to a psychiatric evaluation. This scenario is distinguished from that where the Attorney General petitions the court to order a psychiatric evaluation pursuant to Mental Hygiene Law § 10.06 (d). In the latter case, the individual is entitled to counsel. This is consistent with the provisions of article 9 of the Mental Hygiene Law which extend the right to counsel in all judicial proceedings. (See generally Project Release v Prevost, 722 F2d 960, 976 [2d Cir 1983] [in depth discussion of right to counsel in mental hygiene cases].)
Dr. Rackley’s opinion, which this court finds credible in all respects, was based upon the case review team’s report, an analysis of respondent’s contacts with the criminal justice system, parole and probation reports, correctional facility documents, sex offender treatment documents, an interview with respondent and hospital psychiatric records. Dr. Rackley diagnosed respondent with personality disorder with antisocial features and cognitive disorder NOS (not otherwise specified) (postconcussional disorder) (provisional). She also concluded that he has a mental abnormality as defined by article 10.
The Diagnostic and Statistical Manual of Mental Disorders (hereinafter referred to as DSM) states that personality disorder with antisocial features NOS is present when there is a pervasive pattern of disregard for the rights of others. In addition, the diagnosis requires the presence of three or more of the following:
*410 - failure to conform to social norms with respect to lawful behaviors
- deceitfulness
- impulsivity
- irritability and aggressiveness
- reckless disregard for the safety of others
- consistent irresponsibility
- lack of remorse.
Respondent was found to meet all but one of the above criteria, evidenced in part by his extensive criminal history. Over the last 20 years, respondent has had 11 arrests, 4 of which were for rape. Two of the sexual assaults occurred while he was on parole supervision. During incarceration, respondent incurred more than 30 disciplinary tickets. One of these offenses was for engaging in sexual intercourse in the visiting yard. His consistent irresponsibility and aggressiveness were thus apparent to the interviewing psychologist.
Respondent displayed no remorse for his sexual offenses and occasionally denied culpability, unless he was convinced that an admission would be of benefit to his present circumstance. For example, he initially told Dr. Rackley he did not force himself on the victim in the 1993 rape. He said that she had been his girlfriend and made a sexual complaint against him because she had learned he was involved with someone else. He had also made the same claim in 2004 to the Department of Probation. However, later in his interview, he questioned whether his failure to admit his crime would hurt him. Then, upon reconsideration, he admitted he forced himself on the victim.
Furthermore, while in sex offense therapy, and for many months before Dr. Rackley’s examination, respondent initially denied raping his victims, and received unsatisfactory progress reports. Subsequently, he regularly admitted his culpability and received better reports. He learned quickly that his evaluations were more favorable when he admitted responsibility. It was clear to the examiner that his inconsistent admissions of his wrongdoing were a product of his desire to tell the listener what he believed the listener wanted to hear. Therefore, any admission was neither a genuine acceptance of responsibility nor an expression of remorse. Moreover, respondent engaged in confabulation throughout Dr. Rackley’s interview, frequently providing misinformation about his family history, educational background and relationships.
*411 In addition, the details of respondent’s sexual assaults reflected his impulsivity and aggressiveness. In one instance, he kicked in an apartment door and raped a 14-year-old child. In another case, he entered an elevator with the victim, forced the elevator to the roof and raped the victim.
Accordingly, Dr. Rackley’s credible opinion as to respondent’s personality disorder with antisocial features is amply supported by respondent’s criminal history, medical and therapy reports as well as her evaluation of him.
Dr. Rackley also diagnosed cognitive disorder NOS (postconcussional disorder) (provisional). She described respondent as suffering from executive dysfunction as a result of a head injury. Though respondent was a poor historian in this regard, this is somewhat understandable since the physical trauma occurred when he was hit by a car at the age of seven. Respondent relayed that he was in a coma for months. As an adult, he told a psychologist that he had brain surgery and a plate placed in his head though he had no visible head scarring. In either case, the trauma could only be described as severe.
According to the testimony, severe head trauma can produce perhaps the most intractable disorders associated with executive dysfunction such as the inability for self-determination, self-direction and self-control. These functions all depend on an intact awareness of one’s surroundings and self. Lack of self-awareness compromises insight and empathy both of which Dr. Rackley found absent to a large extent in respondent. She described that persons with executive dysfunction may become disinhibited resulting in a dysfunctional ability to control and direct behaviors. Perhaps the best example of this is respondent having sexual intercourse in the jail yard.
While it is clear to this court that respondent engages in behaviors that amply demonstrate impairment of executive functioning, Dr. Rackley suggested, and this court agrees, that the DSM requirements for a diagnosis of cognitive disorder NOS have not been met. Based upon available information, the DSM requires a greater history of the head trauma and the specific onset of certain symptoms within a short time thereafter. The recent minor memory testing engaged in by Dr. Rackley cannot replace the kind of historical evidence called for by the DSM such as sleep disturbances or specific memory impairment within a few weeks of the trauma. However, given the age of the respondent at the time of the injury and his tendency to confabulate, the specific sequelae of the head injury may never *412 be known. Therefore, Dr. Rackley could not make a definitive diagnosis of cognitive disorder NOS. Instead, the diagnosis was provisional.
It was also suggested that the traits associated with executive dysfunction present in respondent such as poor insight, disinhibition and lack of empathy are no less prevalent simply because they cannot be paired with unknowable historical medical information and, therefore, may not be labeled a cognitive or other disorder defined by the DSM. However, it is the presence of these traits which produce the antisocial behaviors, not the diagnosis of a particular disorder. In any event, the above traits produced by executive dysfunction are largely the same as those for the personality disorder afflicting respondent.
Article 10 of the Mental Hygiene Law does not require that this court find that a respondent suffer from 1, 2 or even 10 disorders specified in the DSM. The DSM is a useful guide to assist in the classification of mental illness. However, it does not speak to what a “mental abnormality” is under article 10. The Legislature has spoken on that issue. The precipitating mental state required to be met for a mental abnormality includes a congenital or acquired condition, disease or disorder (Mental Hygiene Law § 10.03 [i]). Accordingly, the Legislature does not limit the definition of the mental state to only a disorder. Any one or all of these three mental states must affect either the emotional, cognitive or volitional capacity of a person in a manner that predisposes that person to the commission of sex offenses and that result in that person having difficulty in controlling such conduct. As with the range of mental states defined in article 10, the manner in which they affect a person may also be broad, i.e., either emotional, cognitive or volitional. Therefore, it is the synthesis of all the information about the respondent, including the antisocial traits, disorders and expert opinion as to the mental abnormality, rather than simply a specifically classified disorder as listed in the DSM, which the court is mandated to consider when determining whether or not probable cause exists.
It is important to note that the Legislature did not intend a large population of individuals to fall within the purview of article 10. This was accomplished by specifically defining the mental abnormality to require a likelihood to sexually reoffend and serious difficulty in controlling the reoffending urge.
In respondent’s case, he suffers from a personality disorder with antisocial features and has severe impairment of executive *413 functioning. The court finds probable cause to believe respondent suffers from a mental abnormality.
Our final inquiry is an examination into whether there is probable cause that respondent is dangerous and must be confined during the pendency of this case or whether some lesser condition of supervision is appropriate. By stipulation, counsel agree that respondent, an out of state resident, may live with his father in the Bronx as one possible option while this case is pending if there is no probable cause to believe he is dangerous.
It should be noted, at the outset, this court does not consider itself bound to follow the District Court decision in Mental Hygiene Legal Serv. v Spitzer (supra) requiring an independent probable cause finding of dangerousness of the type and to the extent specified in Mental Hygiene Law § 10.07 (f). Nor is this court of the opinion that a separate and distinct finding of dangerousness is somehow implicit in the probable cause phase of article 10. A basic rule of statutory construction is to give the statute its plain meaning. (See McKinney’s Cons Laws of NY, Book 1, Statutes § 94.) Mental Hygiene Law § 10.06 (k) nowhere states that the court must make a finding of dangerousness at the probable cause stage. This is obvious because of the Legislature’s precautions in narrowly defining the mental abnormality to insure that only the most potentially recidivistic and harmful individuals would be the subjects of this proceeding in the first instance. Article 10’s definition of mental abnormality protects a respondent who is mentally ill, but unlikely to harm society. Only those who suffer a mental disorder, disease or condition which affects them in a manner that makes them predisposed to commit a sex offense and that results in that person having serious difficulty in controlling such conduct can be found to have a mental abnormality.
To require an independent finding of dangerousness at the probable cause phase is to suggest that a person who is predisposed to commit a sex offense and has serious difficulty in controlling his conduct has the probability of not being dangerous.[1] This is patently absurd.[2] Therefore, “probability” of dangerousness must be inherent in the Legislature’s definition *414 of mental abnormality. This is distinguished from the dispositional phase of the proceeding.
The degree of dangerousness required for confinement after a verdict against a respondent is raised, as is the burden of proof. (Mental Hygiene Law § 10.07 [f].) If there is a verdict against the respondent, the Legislature requires the court to make a separate finding of dangerousness by proof of clear and convincing evidence, not a “more probable than not standard.”
Moreover, the statutory requirement of a finding of dangerousness by the court after the jury has found a mental abnormality only relates to the level of dangerousness required for confinement versus strict and intense supervision, not to whether the person is dangerous at all. As previously noted, an individual who is a person with a predisposition to commit sex offenses and has serious difficulty in controlling such conduct is per se dangerous to society. This is common sense and looking at the whole of article 10 it is apparent in the sections governing the dispositional phase.* *[3]
Once the trier of fact finds a mental abnormality, the respondent is never free to live in the community without further intensive government intervention. (Mental Hygiene Law § 10.07 [f].) Either he is confined because his mental abnormality involves “such a strong predisposition to commit sex offenses, and such an inability to control behavior” (id. [emphasis added]), or the court shall make a finding that the respondent is a sex offender requiring civil management and subject to strict and intense supervision (which may include GPS or other electronic monitoring, lie detector testing and severe housing restrictions). (Mental Hygiene Law § 10.11 [a] [1], [2]; [b] [1], [2]; [c].) The statute requires one of the two findings above if respondent has a mental abnormality shown by clear and convincing evidence. It is hardly conceivable that the Legislature intended that those who are not considered dangerous on some commonsense level to be subject to supervision or confinement with no consideration of living unsupervised in the community, if the fact of their dangerousness was not contained in the mean *415 ing of mental abnormality.[4] The same definition of mental abnormality applies at the probable cause phase. Accordingly, this court is of the opinion that a probability of dangerousness is contained in the initial finding of probable cause.
The court further concludes that the Legislature intended that all those suffering from a mental abnormality have an inherent probability of dangerousness such as that term is used in the ordinary commonsense way which justifies their pretrial detention. It must rise to a substantially higher degree by clear and convincing evidence to justify posttrial confinement.
This conclusion is consistent with the constitutional procedural safeguards which we must necessarily presume the Legislature considered. Every presumption must be in favor of the validity of a statute.[5] (See Statutes § 150.) “In this regard it has been said that statutes must be construed to avoid not only the conclusion that they are unconstitutional, but also to avoid any grave doubts upon that score.” (Statutes § 150, Comment, at 324.)
In addition, “where an act is susceptible of two constructions, one of which will make it constitutional and the other unconstitutional, the former will be adopted.” (Id.) This court is of the opinion that the Mental Hygiene Legal Serv. v Spitzer decision, which held that Mental Hygiene Law § 10.06 (k) was unconstitutional as written, without a specific individualized showing of dangerousness, unnecessarily considered potential constitutional infirmities because the statute is capable of a construction consistent with constitutionality (i.e., that probable dangerousness is inherent in the definition of mental abnormality). (See discussion at — supra.)[6]
*416 This court concludes that there is no separate finding of “dangerousness” required in the probable cause phase in article 10 as it is presently written. However, should the Legislature choose to add such a provision, this court will consider this issue so that this matter will not have to be relitigated.
Two actuarial assessment tools used to predict recidivism were used by Dr. Rackley to assist in assessing whether respondent is presently dangerous. First, the “Static 99” test demonstrated that respondent was in a group considered to be at high risk to sexually reoffend. The second test, the MnSOST-R, placed respondent at very high risk to reoffend. On average, people with a MnSOST-R score similar to respondent have a 72% sexual recidivism rate within a six-year period.
Further, respondent’s history is indicative of his failure to live crime free while on parole supervision. Specifically, respondent committed two sexual offenses while on parole, one of which occurred just one month after release.
Finally, respondent’s predatory sexual behavior occurred in the building in which he or relatives lived. Therefore, confining such a person to his home does not separate respondent from his past victim pool and it is the opinion of this court that it will not be adequate to protect the public during the pendency of this action.
In conclusion, this court finds probable cause to believe the respondent suffers from a mental abnormality.
Accordingly, this court also finds that there is probable cause to believe that respondent is dangerous and that lesser condi *417 tions of supervision would not suffice during the pendency of this action.
Respondent’s application to be examined by a psychiatrist is granted.

. In the Spitzer case, petitioner advanced the argument that dangerousness was inherent in the definition of mental abnormality.

. See Statutes § 145, Comment (“[a]n intent patently absurd is not to be attributed to the Legislature, and it will be presumed that the Legislature did *414 not intend an absurd result to ensue from the legislation enacted” [citations omitted; emphasis added]).

. See Statutes § 97, Comment (“[i]t is a fundamental rule of statutory construction that a statute . . . is to be construed as a whole, and that all parts of an act are to be read and construed together to determine the legislative intent. So, in construing a statute the court must take the entire act into consideration, or look to the act as a whole, and all sections of a law must be read together to determine its fair meaning” [citations omitted]).

. See generally Statutes § 94 (words in statutes to be given their “appropriate meaning, and sense must be brought out of the words used” [citations omitted]).

. See Statutes § 150 (Statutes are presumed valid and constitutional. Such presumption is rebuttable, but only “when the legislation is proven beyond a reasonable doubt to be in conflict with the Constitution, arbitrary and confiscatory, or wholly without rational basis” [citations omitted]).

. In addition, at the time of the arguments and the court’s decision, the intervenor’s issue was moot as he had violated his parole and was detained pursuant to that violation. (Briefly, the Mental Hygiene Legal Service filed a declaratory judgment seeking that the district court declare section 10.06 [k], among other provisions, unconstitutional and issue injunctive relief. In addition, there was an intervenor, subject to provisions of the act, who joined the action. He was out on parole and per Mental Hygiene Law § 10.06 [k] could be detained on a probable cause finding pending trial.)
*416 28 USC § 2201, which provides for declaratory judgments, requires that there be an actual controversy. “A ‘controversy’ in this sense must be one that is appropriate for judicial determination. A justiciable controversy is thus distinguished from a difference or dispute of a hypothetical or abstract character; from one that is academic or moot.” (Gilbert, Segall & Young v Bank of Montreal, 785 F Supp 453, 458 [SD NY 1992] [emphasis added].)
Further, the Spitzer court’s concern over the stigma that would attach to an article 10 respondent being labeled a sex offender is unpersuasive. Any person subject to article 10 is a convicted felony sex offender who would be subject to the Sex Offender Registration Act. Such person would already be labeled a sex offender and, after a hearing {see Doe v Pataki, 3 F Supp 2d 456 [SD NY 1998]), would have a risk level assigned of one, two or three. Two of those risk levels result not only in being labeled a sex offender, but in community notification which can include the name, photograph and address of a sex offender. Even a level one sex offender’s name and risk level may be disclosed to callers to the Division of Criminal Justice Services telephone number.
These arguments in no way reflect on the merits of the Spitzer court’s consideration of GPL article 730 detainees subject to article 10.