OPINION OF THE COURT
Colleen D. Duffy, J.
On May 26, 2011, this court held a probable cause hearing arising out of a petition, filed on January 14, 2011, by the New York State Attorney General (petitioner), pursuant to article 10 of the Mental Hygiene Law, seeking a determination that respondent Enrique T. is a detained sex offender requiring civil management.
Dr. Katrina Colistra, a licensed psychologist, who was qualified by the court as an expert in the field of psychology, testified on behalf of petitioner. Respondent presented no witnesses.
At the conclusion of the hearing, petitioner asked the court to make a finding of dangerousness with respect to respondent and to direct that he be civilly confined pursuant to Mental Hygiene Law § 10.06 (k) pending a trial on the matter.[1] (Transcript of hearing, dated May 26, 2011 [hereinafter tr], at 76.)
Based upon the evidence presented at the hearing, the court found that petitioner had established that there is probable cause to believe that respondent is a detained sex offender requiring civil management. (Tr at 78-79.) The court issued an interim order finding that respondent would be a danger to the community, in part because no form of community supervision pending the outcome of the article 10 petition is provided for in article 10. (Tr at 79.) The court informed the parties that it would issue a written decision. (Tr at 82.)
On June 13, 2011, the court reopened the hearing to allow the parties to present additional evidence on the issue of civil *321 confinement of respondent pending a trial in the proceeding.[2] Although the court heard additional argument on the matter, no new evidence was presented by either party. (Transcript of reopened hearing, dated June 13, 2011 [hereinafter tr No. 2], at 6-8.)
For the reasons set forth below, the court finds facially unconstitutional that provision of Mental Hygiene Law § 10.06 (k) which mandates confinement of a respondent pending trial after a court has made a finding of probable cause to believe that a respondent is a sex offender requiring civil management.
The United States Supreme Court in United States v Salerno (481 US 739 [1987]) held that the due process protections of the Fifth and Fourteenth Amendments to the United States Constitution mandate a specific finding of dangerousness of a respondent in a pretrial detention context.[3] The Supreme Court held that any such pretrial detention also requires a finding that lesser conditions than confinement would not suffice to protect the community. (481 US at 750.)
Mental Hygiene Law § 10.06 (k) does not provide for any such finding. The statute’s pretrial detention scheme contains none of the procedural safeguards necessary to ensure that the strong liberty interest of a respondent is properly protected. Nor does this court have the power to imbue the statute with terms that do not exist and that would convolute or undermine the plain language of the statute.
Section 10.06 (k) mandates civil confinement of a respondent after a court’s finding that a respondent is a “sex offender requiring civil management” — without any delineation between a “dangerous sex offender requiring confinement” and a “sex *322 offender requiring strict and intensive supervision” — both of which are included in the definition of “sex offender requiring civil management.” (Mental Hygiene Law § 10.03 [q].)
The statute provides no means to effectuate any finding by a court that lesser conditions than confinement (e.g., supervision, medication, community-based treatment) would suffice to protect the community from a respondent pending a civil management trial. Indeed, even if such a finding were to be made, there is no option in the statute that allows for release— under any circumstances — of a respondent where a finding of probable cause has been made that he or she is a sex offender requiring civil management.
Thus, as set forth further herein, the court finds that the portion of Mental Hygiene Law § 10.06 (k) that mandates civil confinement of respondent after a finding of probable cause imposes such a severe liberty restraint on respondent pending trial (even more severe than the consequences likely to be imposed on respondent after a trial), and provides no option or alternative for lesser restrictions, that it is facially unconstitutional.
The court also notes that there is no other provision in article 10 that addresses the issue of release (or confinement) of a respondent pending trial. As set forth further herein, this court has no power to redraft legislation and it is impossible to construe section 10.06 (k) in a way to allow respondent to be released after a finding of probable cause upon less restrictive conditions than confinement to ensure public safety.
This is just such a case where less restrictive conditions would suffice to protect the public during the pendency of respondent’s trial. First, as noted herein, the Attorney General wholly failed to provide any evidence at the initial probable cause hearing or the reopened hearing to show that lesser conditions than confinement would not suffice to protect the community from respondent if he were to be released. Moreover, a recent report prepared at the order of the court by the New York State Office of Mental Health (OMH) recommends that respondent be released into the community under appropriate supervision and treatment (hereinafter, SIST Report).[4]
Despite the OMH findings and dearth of evidence presented *323 by petitioner regarding the insufficiency of less restrictive conditions than confinement, Mental Hygiene Law § 10.06 (k) precludes the court from releasing respondent under appropriate conditions pending trial. For all of the foregoing reasons and discussed more fully below, the court finds Mental Hygiene Law § 10.06 (k) unconstitutional on its face.
As the court has determined that that portion of Mental Hygiene Law § 10.06 (k) is facially unconstitutional, the court cannot enforce its provisions. And, as there is no constitutional provision in article 10 authorizing the court to order respondent’s detention pending trial after a probable cause finding that respondent is a sex offender requiring civil management, nor one authorizing the court to release respondent under certain terms and conditions, the court is constrained to order respondent to be released forthwith.
I. Procedural History* *[5]
On January 14, 2011, the New York State Attorney General filed a petition contending that respondent is a detained sex offender requiring civil management pursuant to article 10 of the Mental Hygiene Law.
On May 26, 2011, this court held a probable cause hearing in the matter pursuant to Mental Hygiene Law § 10.06, to determine whether there is probable cause to believe that respondent is a detained sex offender requiring civil management.
At the probable cause hearing, the Attorney General contended that respondent was dangerous and sought a finding to that effect.
At the conclusion of the hearing, on May 26, 2011, the court found probable cause exists to believe that respondent is a detained sex offender requiring civil management. (Tr at 76.) The court further found that respondent would be a danger to the community if left unsupervised, and, since article 10 does not specifically provide for supervised release into the community pending trial, ordered that respondent be confined pending trial. (Tr at 78-79.) The court did, however, order an *324 investigation to determine if strict and intensive supervision (SIST) in the community would be appropriate for respondent. (Tr at 79.) The court advised the parties that a written decision would be issued. (Id. at 82.)
In its written decision, the court reiterated its finding of probable cause that respondent is a detained sex offender requiring civil management. (See 31 Misc 3d 1237[A], 2011 NY Slip Op 51027[U] [2011] [decision on probable cause hearing].) The court reserved decision on the issue of whether respondent may be civilly confined pending the outcome of the article 10 proceeding, and reopened the hearing on that issue on June 13, 2011. (Id.)
At the reopened hearing on June 13, 2011, no party presented any additional evidence or testimony. The Attorney General contended that, since no lesser conditions of supervision are provided for by the statute, no lesser conditions of supervision would suffice to protect the public pending trial. (Tr No. 2 at 6-9.) The Attorney General argued that since the statute did not provide for SIST (or any type of supervision) pending trial, and the respondent was a danger without supervision, it had met its burden of establishing that no lesser conditions would suffice to protect the public. (Id. at 6-7.)
On that same date, June 13, 2011, the court also executed the order for a SIST investigation of respondent and adjourned the matter to August 1, 2011 for the report. (Tr No. 2 at 11.) The SIST Report was completed on July 14, 2011 and the court received it on July 27, 2011.
II. The Statutory Background of Article 10
A. Statutory Procedures of Article 10
In 2007, the New York State Legislature passed the Sex Offender Management and Treatment Act (SOMTA), which, among other things, includes article 10 of the Mental Hygiene Law of New York State, with the stated goal of addressing the danger to society posed by recidivist sex offenders. (Mental Hygiene Law § 10.01 [a].) The act was signed into law by then-Governor Eliot Spitzer on March 14, 2007, and became effective April 13, 2007.
Determining that some sex offenders have mental abnormalities that predispose them to engage in repeated sex offenses, the Legislature enacted SOMTA which provides that a person who is determined to be a detained sex offender with a mental abnormality, as those terms are defined in section 10.03 (g) and *325 (i),[6] would be subject to civil management after that person had served his or her criminal sentence. (Mental Hygiene Law § 10.01 [b]-[g].) Civil management may take the form of either civil confinement in a secure treatment facility or strict and intensive supervision. (Mental Hygiene Law § 10.01 [b], [c], [d]; § 10.07 [f].)
SOMTA provides that, within a specified time frame, either a Supreme or County Court judge shall hold a probable cause hearing to determine whether there is probable cause to believe that the respondent is a sex offender requiring civil management. (Mental Hygiene Law § 10.06 [g]-[k].)[7]
If the court determines that such probable cause exists to believe that a respondent is a sex offender requiring civil management, the respondent must be civilly confined pending a trial on the matter. (Mental Hygiene Law § 10.06 [k].)
Specifically, Mental Hygiene Law § 10.06 (k) provides, in relevant part, that
“[i]f the court determines that probable cause has been established: (i) the court shall order that the respondent be committed to a secure treatment facility designated by the commissioner for care, treatment and control upon his or her release, provided, however, that a respondent who otherwise would be required to be transferred to a secure treatment facility may, upon a written consent signed by the respondent and his or her counsel, consent to remain in the custody of the department of correctional services pending the outcome of the proceedings under this article, and that such consent may be revoked *326 in writing at any time; . . . (iii) the respondent shall not he released pending the completion of such trial.” (Emphasis added.)
Upon any such finding of probable cause, the court must schedule a trial, before a 12-person jury, or a judge if the respondent in that case waives a trial by jury, within 60 days.[8] (Mental Hygiene Law § 10.07 [a].)
At the trial, the petitioner (the State of New York through the office of the Attorney General) carries the burden of proving that the respondent in the matter is a detained sex offender who has a mental abnormality by clear and convincing evidence. (Mental Hygiene Law § 10.06 [d].)
If, after a trial, a jury (or the court if a jury has been waived by respondent) finds that a respondent is a detained sex offender who suffers from a mental abnormality, then the court must consider whether the respondent is a dangerous sex offender requiring confinement or a sex offender requiring strict and intensive supervision. (Mental Hygiene Law § 10.07 [f].) The parties may offer additional evidence and the court shall hear argument as to that issue. (Id.) The statute provides no time frame as to when such a proceeding must occur after a determination of mental abnormality by a jury (or the court).
If a court finds by clear and convincing evidence that a respondent has a mental abnormality involving such a strong predisposition to commit sex offenses, and such an inability to control behavior that the respondent is likely to be a danger to others and to commit sex offenses if not confined to a secure treatment facility, the court shall find such respondent to be a dangerous sex offender requiring confinement, and order such confinement. (Mental Hygiene Law § 10.07 [f].) If the court does not find that a respondent is a dangerous sex offender requiring confinement, then the court shall make a finding that the respondent is a sex offender requiring SIST in accordance with section 10.11 of article 10. (Id.) With respect to this disposition, the court shall consider the conditions that would be imposed pursuant to SIST. (Id.)
B. Persons Subject to Sex Offender Civil Management
Pursuant to SOMTA, in order to be subject to civil management as set forth in Mental Hygiene Law § 10.01 et seq., the *327 person must have been convicted of a sex offense, as defined in article 10, which includes, among others, a “sexually motivated felony.” (Mental Hygiene Law § 10.03 [p].)[9]
SOMTA also provides that certain persons who committed crimes before the enactment of SOMTA still may be subject to the civil management provisions of the statute.
For example, a person who was convicted of a sex offense, such as rape or incest, prior to the enactment of SOMTA, may be subject to the civil management provisions of SOMTA if a civil jury (pursuant to the procedures described above) finds such person to be a detained sex offender who suffers from a mental abnormality.
Other individuals who, prior to the enactment of SOMTA, were convicted of one or more certain designated felonies set forth in Mental Hygiene Law § 10.03 (f) that were not sex offenses prior to the enactment of SOMTA also may be subject to the civil management provisions of SOMTA if a civil jury, pursuant to the process described above, finds, by clear and convincing evidence, that such prior crime was “sexually motivated,” and, if so, whether such person “is a detained sex offender who suffers from a mental abnormality.”[10] (Mental Hygiene Law § 10.07 [c].)
III. Legislative Intent
New York is one of 19 other states and the District of Columbia and the federal government to have enacted civil management statutes such as SOMTA with the intent of addressing “a *328 compelling need ... to protect residents of this state from sex criminals whose recidivism is predictable and uncontrollable.” (Governor’s Program Bill Mem, Bill Jacket, L 2007, ch 7, at 10; see e.g. Mental Hygiene Law § 10.01 [a], [b], [c], [e], [f].)
The Legislature, in enacting SOMTA, noted that SOMTA establishes comprehensive reforms to enhance public safety by allowing the state to manage sex offenders upon the expiration of their criminal sentences through civil confinement or strict and intensive supervision. (Governor’s Program Bill Mem, Bill Jacket, L 2007, ch 7, at 5.) The Legislature noted that there is a small group of sex offenders who, because of a mental abnormality, cannot control their sexually violent behavior. Accordingly, SOMTA was enacted to mandate treatment as well as confinement or strict and intensive supervision for sex offenders depending upon their level of risk. (Id. at 10.)
With respect to “mental abnormality” as that term is defined in section 10.03 (i), there is no such diagnosis in the mental health field; the term lacks any psychiatric validity. (John Q. LaFond, Preventing Sexual Violence, at 133 [2005]; see also Young v Weston, 898 F Supp 744, 747 [1995] [term has neither clinically significant meaning nor recognized diagnostic use among treatment professionals].) Indeed, “mental abnormality” is a legal term, not a medical one, and appears to have been first coined by the Kansas legislature when it enacted that State’s civil commitment statute, one of the first such statutes enacted. (Kansas v Hendricks, 521 US 346, 358-359 [1997]; LaFond, Preventing Sexual Violence, at 133.)
In a 5-4 decision in 1997 in Kansas v Hendricks (521 US 346 [1997]), the Supreme Court deferred to these legislative purposes in upholding the constitutionality of a comparable statutory scheme. There, the Court accepted the legislative determination underlying that state’s statute that sex offenders recidivate at a rate greater than non-sex offenders.[11]
Notably, Justice Kennedy’s concurring opinion, which joined the opinion of four other justices supporting the constitutionality of the Kansas statute, but warned against using civil commitment for penal purposes, focused upon the importance of the *329 statute’s treatment scheme.[12] (521 US at 371-372.) The Court determined that the treatment options available in the Kansas scheme are evidence of the non-punitive nature of the statute. {Id. at 366-367.)
The court also equated the Kansas statute’s definition of “mental abnormality” with that of the mental illness standard required in the civil commitment context in upholding the constitutionality of the statute. (Id. at 359.)
IV. Relevant Cases and Precedent
A. United States Supreme Court Decisions on Detention Statutes
The United States Supreme Court has decided several cases that are relevant to the issue of the constitutionality of Mental Hygiene Law § 10.06 (k). In addition, both state and federal courts in New York have discussed and/or analyzed the section of the Mental Hygiene Law at issue here.
In United States v Salerno, a case involving challenges to the constitutionality of the pretrial detention provisions of the Federal Bail Reform Act of 1984 (Bail Reform Act), the United States Supreme Court articulated the factors that a court must consider in determining whether a pretrial detention scheme *330 meets the constitutional due process requirements of the Fifth and Fourteenth Amendments to the United States Constitution. (481 US at 746.)
There, the Court noted that a facial challenge to a legislative act is extremely difficult as the facial constitutionality of such legislation will be upheld unless no set of circumstances could exist wherein the legislation would be valid. (481 US at 745.) The Court analyzed the federal legislation at issue via a substantive due process scrutiny and a procedural due process scrutiny.[13] (Id. at 745-746.)
In Salerno, the Court upheld the Bail Reform Act noting that the first step is to ascertain whether the liberty restriction constitutes impermissible punishment or permissible regulation. {Id. at 746.) The Court found that the legislature intended the pretrial detention scheme to be regulatory, that is, civil in nature, not penal. {Id.)
The inquiry requires the court to determine whether “an alternative purpose to which [the restriction] may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned. {Id. at 747, quoting Kennedy v Mendoza-Martinez, 372 US 144, 168-169 [1963].)
In Salerno, the Supreme Court pointed out that the legislature had important governmental interests in protecting the safety of the public and had narrowly and carefully crafted legislation that procedurally safeguarded the liberty interests of the respondents who were subject to the Bail Reform Act. (481 US at 750.) The Supreme Court noted that the Bail Reform Act operates only on individuals who have been arrested for a specific category of very serious criminal offenses. {Id.)
The Court examined the legislative history of the Bail Reform Act and noted that Congress had specifically determined that individuals who were charged with the enumerated crimes were far more likely to be responsible for dangerous acts in the community after arrest. {Id.)
The Court concluded that the Bail Reform Act withstood the challenge that it violated the Fifth Amendment Due Process Clause; the Supreme Court found that the procedural protections built into the Bail Reform Act — that probable cause must *331 be established that the person at issue had committed one of the enumerated serious crimes, and that, even if probable cause were to be established in such a case, a “full-blown adversary hearing” is required at which the government must establish “by clear and convincing evidence that no conditions of release can reasonably assure the safety of the community or any person” — and the legitimate and compelling regulatory purpose of the Bail Reform Act were not outweighed by an individual’s strong interest in liberty. (481 US at 750.)
In Salerno, the Court recognized that “[i]n our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception.” (481 US at 755.) Nonetheless, the Supreme Court held that, given the procedural safeguards built into the legislation, together with the congressional intent underlying the Bail Reform Act, the pretrial detention provisions of the Act fall within that carefully limited exception to liberty. (481 US at 755.)
Because Mental Hygiene Law § 10.06 (k) is civil, not penal in nature and intent, the Supreme Court’s decisions in the field of confinement of mentally ill individuals also is instructive with respect to an analysis of the constitutional validity of Mental Hygiene Law § 10.06 (k).
In 1975, in O’Connor v Donaldson (422 US 563 [1975]), the Supreme Court held that it was unconstitutional for a state to continue to confine a harmless, mentally ill person. There, the Court ruled that, as a matter of constitutional due process, even if the initial commitment of the person was permissible, confinement could not continue if the basis for such confinement — current mental illness and dangerousness — no longer existed. (422 US at 574-576.)
A few years later, in 1979, in Addington v Texas (441 US 418 [1979]), the United States Supreme Court held that constitutional due process required the government to prove two statutory preconditions by clear and convincing evidence before a court could commit an individual to a mental institution: (1) that the person sought to be committed is mentally ill; and (2) that such person requires hospitalization for his own welfare and protection of others. (Id. at 432-433.)
In Addington, the issue was not pretrial detention, but rather the requisite standard of proof to civilly confine a person (clear and convincing, not preponderance of the evidence). (441 US at 419.)
*332 A year later, in Vitek v Jones (445 US 480, 492-493 [1980]), the Supreme Court held that, absent a determination in a civil commitment proceeding of current mental illness and dangerousness, even an incarcerated prisoner serving a criminal sentence could not be transferred to a mental institution. There, the Supreme Court noted that even a .convicted felon serving his criminal sentence has a liberty interest, which is not extinguished by his criminal confinement, in not being transferred to a mental institution and thus classified as mentally ill. (445 US at 493.) The Court held that “[t]he loss of liberty produced by an involuntary commitment is more than a loss of freedom from confinement.” (Id. at 492.) That case, like Addington, did not address pretrial detention.
In 1992, in Foucha v Louisiana (504 US 71, 79 [1992]), the Supreme Court held that civilly confining an individual who no longer suffered from a mental illness was unconstitutional. There, the individual at issue previously had been found not guilty of a crime by reason of insanity and was committed to a mental institution. (Id.) Sometime thereafter, the state sought to continue his confinement even though he was no longer suffering from a mental disease or illness. (504 US at 75.) The Court found that such confinement violated the individual’s due process rights even if he might be dangerous because civil confinement requires a finding, by clear and convincing evidence, of both mental illness and dangerousness. The Court held that “[d]ue process requires that the nature of [the] commitment bear some reasonable relation to the purpose for which the individual is [being] committed.” (504 US at 79.)
In Foucha, the Court took note of the fact that in Salerno it had carved out certain narrow circumstances in which limited confinement of persons who pose a danger to others or to the community would be constitutional. (504 US at 79-80.)
In Foucha, the Court noted that its decision in Salerno that a federal pretrial detention statute was constitutional was based on the fact that the statute at issue explicitly and carefully limited the circumstances under which detention could be sought to those involving the most serious of crimes and was narrowly focused on a particularly acute problem in which government interests are overwhelming. (Id. at 81.) The Supreme Court reiterated that its finding that the pretrial detention scheme in Salerno met constitutional muster also was based on the fact that the statute at issue contained procedural safeguards — requiring a finding of probable cause followed by a *333 full blown adversarial hearing by clear and convincing evidence that no conditions of release can reasonably assure the safety of the community. (504 US at 81.) The Court also noted that the duration of such confinement under that federal statute was strictly limited. (Id.)
In determining that Louisiana’s scheme of civil confinement in Foucha failed to meet the constitutional requirements it had identified in Salerno, the Supreme Court noted that, unlike the sharply focused statute in Salerno, Louisiana’s scheme of confinement “[wa]s not carefully limited.” (504 US at 81.) The Court pointed out that the Louisiana statute did not afford Mr. Foucha “an adversary hearing at which the State must prove by clear and convincing evidence that he is demonstrably dangerous to the community.” (Id. at 81.) The Court observed that the Louisiana statute at issue did not require the state to prove anything; it put the burden on the detainee to prove he was not dangerous. (Id. at 83.)
In concluding that the Louisiana detention scheme at issue before it was unconstitutional, the Court emphasized its finding in Salerno that “detention prior to trial or without trial is [a] carefully limited exception” to the norm of liberty. (Id.)
B. Federal and State Court Decisions on Mental Hygiene Law § 10.06 (k)
Earlier this summer, on July 1, 2011, in United States v Timms (2011 WL 2610566, 2011 US Dist LEXIS 71318), the United States District Court for the Eastern District of North Carolina undertook an extensive due process and equal protection analysis of the federal sex offender civil management act— The Adam Walsh Child Protection and Safety Act of 2006 (the Adam Walsh Act) — and determined that, as applied to the respondent in that action, the Adam Walsh Act violated the respondent’s Fifth Amendment rights to equal protection[14] and due process of law.
*334 The court found that the lack of any provision in the Adam Walsh Act specifying a time period within which a judicial hearing on a detainee’s commitment under the act violated the respondent’s Fifth Amendment due process rights. (2011 WL 2610566 at **9, 2011 US Dist LEXIS 71318 at *27-28.) The court found that the Act unconstitutionally allows a uni *335 lateral and unreviewable deprivation of liberty to continue indefinitely. (Id.)
With respect to the specific statute at issue in this proceeding, Mental Hygiene Law § 10.06 (k), federal and New York courts already have examined its constitutionality within the context of due process; the United States District Court for the Southern District of New York has applied the constitutional analysis utilized by the Supreme Court in Salerno to find Mental Hygiene Law § 10.06 (k) facially unconstitutional.
In fact, just seven months after SOMTA was enacted, in November 2007, the Southern District, in Mental Hygiene Legal Serv. v Spitzer (2007 WL 4115936, 2007 US Dist LEXIS 85163 [MHLS-I]), temporarily enjoined the Attorney General from enforcing section 10.06 (k), finding that Mental Hygiene Legal Service likely would succeed at trial in demonstrating that Mental Hygiene Law § 10.06 (k) is facially unconstitutional. (2007 WL 4115936 at *2, 2007 US Dist LEXIS 85163 at *4.)
In that preliminary injunction proceeding, the Southern District cited to Salerno in noting that when a criminal proceeding may result in an adjudication of detention, a court may detain a defendant pending trial on a finding of probable cause to believe that the defendant committed the crime “plus a finding that lesser conditions of supervision during pendency of the action will not be sufficient to guarantee the safety of the community.” (MHLS-I, 2007 WL 4115936 at *12, 2007 US Dist LEXIS 85163 at *41.) The court held that “[t]here is no reason why a similar standard should not apply in civil commitment proceedings.”[15] (Id.)
In MHLS-I, the Southern District rejected the Attorney General’s- assertion that Mental Hygiene Law § 10.06 (k) met constitutional muster because the requisite procedural due pro *336 cess safeguards were implicit when a court makes a probable cause finding that respondent is a sex offender requiring civil management. (2007 WL 4115936 at *12-13, 2007 US Dist LEXIS 85163 at *42-44.)
The MHLS-I court noted that a finding that there is probable cause to believe that an individual requires some sort of civil management and may be dangerous if not treated does not necessarily mean that such a person will be dangerous if released. (2007 WL 4115936 at *13, 2007 US Dist LEXIS 85163 at *44.) The court noted that Salerno requires a specific finding of dangerousness, not a generalized finding. (2007 WL 4115936 at *14, 2007 US Dist LEXIS 85163 at *49.)
The court also noted that another provision of article 10 specifically delineates between a person who is found to have a mental abnormality and a dangerous sex offender requiring confinement, but that Mental Hygiene Law § 10.06 (k) makes no such distinction between those individuals who may not be a danger to the public if controlled by medicine, treatment or a form of supervision and those who likely would be sexually violent if released. (2007 WL 4115936 at *13-14, 2007 US Dist LEXIS 85163 at *43-49.)
There, the court found that automatic detention pursuant to Mental Hygiene Law § 10.06 (k) after a finding of probable cause can be catastrophic to an individual resulting not just in the loss of liberty, but also significant negative financial consequences as well. (2007 WL 4115936 at *14, 2007 US Dist LEXIS 85163 at *48.) The court noted that the mandatory detention provisions of Mental Hygiene Law § 10.06 (k) create a perverse situation where a person may be deprived of more liberty before the person is adjudicated to have a mental abnormality than the consequence he or she faces after such an adjudication. (2007 WL 4115936 at *14, 2007 US Dist LEXIS 85163 at *48.)
The court also noted that Mental Hygiene Law article 10 provides that a trial be held within 60 days after the probable cause hearing. Thus, in theory, the shortest period of mandatory incarceration provided by article 10 is 63 days.[16] In practice, however, respondents frequently are confined pretrial pursuant to Mental Hygiene Law § 10.06 (k) for periods far exceeding 60 *337 days.[17] Moreover, even after a jury renders a determination of mental abnormality, there is no mandated timetable within which the dispositional phase of the proceeding — wherein a court determines if such respondent is a dangerous sex offender requiring confinement or a sex offender requiring strict and intensive supervision — must occur.
The Southern District noted the disparity between the length of time set forth in the statute for when a trial is to begin and the actual length of time between a finding of probable cause and the commencement of a trial and found that this automatic detention provision of Mental Hygiene Law § 10.06 (k) operates as a
“hammer to coerce individuals to enter into plea arrangements . . . thereby accepting] both designation as a sex offender [requiring civil management] and intensive ongoing treatment in order to avoid spending what [turns out to be] more than 60 days in involuntary confinement . . . even if he believes he may avoid any adverse consequences by going to trial.” (2007 WL 4115936 at *14, 2007 US Dist LEXIS 85163 at *50.)
In MHLS-I, the Southern District also rejected the Attorney General’s contention that Mental Hygiene Law § 10.06 (k) withstands a constitutional challenge to its facial invalidity because there must be a showing that there is no set of circumstances under which the statute would be valid. The court found that there is no set of circumstances under which the statute could be deemed valid because “mandatory detention pending trial, without the showing of dangerousness necessary to justify such detention, is on its face invalid.”[18] (2007 WL 4115936 at *15 n 19, 2007 US Dist LEXIS 85163 at *52 n 19.)
*338 Recently, on March 29, 2011, in that same case (now entitled Mental Hygiene Legal Serv. v Cuomo, 2011 WL 1344522, 2011 US Dist LEXIS 40434 [MHLS-II]), the Southern District issued a permanent injunction precluding the Attorney General from seeking to enforce the provisions of Mental Hygiene Law § 10.06 (k); the Southern District found that the automatic detention provisions of the statute triggered upon a finding of probable cause that a respondent is a detained sex offender requiring civil management — without a judicial proceeding to determine dangerousness — violate the United States Constitution.[19] (2011 WL 1344522 at *15, 2011 US Dist LEXIS 40434 at *49-50.)
The Southern District explicitly rejected the determinations of some New York courts that the New York Legislature intended that Mental Hygiene Law § 10.06 (k) implicitly requires a probable cause finding that the respondent is dangerous to society and that lesser conditions of supervision than incarceration will not suffice. (MHLS-II, 2011 WL 1344522 at *11, 2011 US Dist LEXIS 40434 at *39-40.)
The Southern District held that such an interpretation does not avoid the constitutional problem in that, although the statute allows respondents who are found after trial to require civil management to either be committed to a secure facility or to be placed on strict probation-like supervision, section 10.06 (k) requires detention of all sex offenders requiring civil management, even those who may be found after trial to be released to the community on SIST. (Id.) The court held that Mental Hygiene Law § 10.06 (k) is facially unconstitutional because it mandates pretrial commitment of a respondent after a finding of probable cause and does not allow for the “individualized and specific determination of dangerousness that the Constitution requires in civil commitment cases.”[20] (2011 WL 1344522 at *11, 2011 US Dist LEXIS 40434 at *40.)
*339 Neither the Court of Appeals nor an appellate court in New York yet has published a decision on the constitutionality of Mental Hygiene Law § 10.06 (k). And, since SOMTA’s enactment, New York courts have varied greatly in their approaches to this issue of pretrial detention pursuant to Mental Hygiene Law § 10.06 (k).
As an initial matter, many New York trial courts, in article 10 cases, have found that the Attorney General has made a sufficient showing of dangerousness and that no lesser conditions would suffice to protect the community to justify pretrial confinement of a respondent.
For example, in Matter of State of New York v C.B. (19 Misc 3d 1103[A], 2008 NY Slip Op 50488[U], *4-5 [Sup Ct, Bronx County 2008]), the trial court determined that respondent’s criminal history, his failure to take prescribed medication, his nonparticipation in sex offender treatment either at that current time or while he had been incarcerated, respondent’s lascivious behavior and exhibitionism while in Manhattan Psychiatric Center, and expert opinion that respondent would be a danger to the public if treated in an outpatient or community-based setting were evidence that there is probable cause that respondent is a sex offender requiring civil management and that he is sufficiently dangerous to require confinement because no lesser conditions of supervision would suffice to keep the public safe during the pendency of the proceeding.
Although the trial court in Matter of State of New York v P.H. (22 Misc 3d 689, 711-712 [Sup Ct, NY County 2008]) also agreed with and adopted the holding of MHLS-I, the decision was bereft of any facts to show that no lesser conditions of supervision would suffice to protect the public. The court noted only that the respondent “has no apparent ability to control his voyeurism and exhibitionism and that such conduct has led in the past directly to a hands-on sexual offense” to support its finding that respondent is sufficiently dangerous to require confinement and that lesser conditions of supervision would not suffice to protect the public.[21] (22 Misc 3d at 712.)
Although a few New York courts have held that the Legislature implicitly intended dangerousness in a probable cause find *340 ing[22] and have rejected the finding by the Southern District in MHLS-I — that an individualized finding of dangerousness and a determination that no lesser conditions would suffice to protect the public is necessary to order pretrial detention — each court purported to make such a finding anyway, apparently, just in case. (See e.g. People v Brooks, 19 Misc 3d 407, 413 [Sup Ct, Kings County 2008];[23] Matter of State of New York v Sanchez, 22 Misc 3d 1123[A], 2009 NY Slip Op 50256[U], *3 [Sup Ct, Richmond County 2009].)[24]
A number of New York courts, applying “rules of construction,” have found that the Legislature intended that Mental Hygiene Law § 10.06 (k) implicitly requires that a court must make two findings: (1) probable cause to believe that respondent is a sex offender requiring civil management, and (2) probable cause to believe respondent is dangerous to society and there is no viable alternative to incarceration pending outcome of trial, i.e., lesser conditions of supervision will not suffice to *341 protect the community. (See e.g. State of New York v J.J., 19 Misc 3d 196, 204 [Sup Ct, Nassau County 2008].)[25]
As set forth below, the court respectfully disagrees with the analyses of the statute by its sister courts on this issue and finds that due process and the plain language of the statute mandate the inescapable conclusion, also reached by the Southern District in MHLS-I and MHLS-II, that Mental Hygiene Law § 10.06 (k) is facially unconstitutional.
Moreover, as discussed below, this court is not empowered to imbue a facially unconstitutional statute with terms outside its own provisions in an attempt to “rehabilitate” its unconstitutional nature. And, even if the court were able to so construe Mental Hygiene Law § 10.06 (k) to require — as detailed in MHLS-I and MHLS-II — confinement only after an individualized finding of dangerousness and that no lesser conditions than confinement would protect the community, in this case, no such finding could be made as the SIST Report makes clear that respondent could be safely released to the community under supervision.
The statute also does not allow for release of a respondent if dangerousness and the insufficiency of lesser restrictions than confinement are not found by a court. Thus, the plain language of Mental Hygiene Law § 10.06 (k) mandates pretrial confinement after a finding of probable cause with no option for release. Based upon the due process rights of respondent and the judicial constraints that preclude this court from redrafting legislation, the court finds Mental Hygiene Law § 10.06 (k) to be unconstitutional.
*342 V Conclusions of Law
The Fifth Amendment to the US Constitution guarantees that “[n]o person shall be . . . deprived of life, liberty, or property, without due process of law.” The United States Supreme Court has articulated a two-step analysis with respect to any claim of a due process violation under the Fifth Amendment. (Morrissey v Brewer, 408 US 471, 481 [1972].)
First, the court must determine if a liberty interest is affected. (Id.) If a liberty interest is at stake, then the court must determine the process which is due. (Id.)
In determining what process is due in a particular circumstance, the Supreme Court, in Mathews v Eldridge (424 US 319, 334-335 [1976]), set forth three factors that a court must weigh: (1) the private interest that will be affected by the official action; (2) the risk of erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute safeguards; and (3) the government’s interest in the procedure used, including the function involved and the fiscal and administrative burdens that additional or substitute procedural requirements would entail. (Id. at 334-335, citing Goldberg v Kelly, 397 US 254, 263-271 [1970].)
A. Respondent’s Liberty Interest
“Freedom from bodily restraint has always been at the core of the liberty protected by the Due Process Clause [of the Fifth Amendment to the Constitution of the United States of America].” (Foucha, 504 US at 80, citing Youngberg v Romeo, 457 US 307, 316 [1982].) The Supreme Court has held that “[i]t is clear that commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection.” (Foucha at 80, quoting Jones v United States, 463 US 354, 361 [1983].) Absent sufficient procedural safeguards, freedom from bodily restraint is a right that generally cannot be abridged. (Vitek v Jones, 445 US 480, 492 [1980].)
With respect to the statute at issue here, Mental Hygiene Law § 10.06 (k) mandates confinement of a respondent upon a finding that there is probable cause to believe that respondent is a sex offender requiring civil management. The section also mandates that such a respondent must be so confined pending the completion of a sex offender civil management trial. Although, pursuant to Mental Hygiene Law § 10.07 (a), the trial of the matter is to be conducted within 60 days of the probable cause determination, there is no time frame set forth in the *343 statute with respect to scheduling or completing the dispositional phase of the trial (wherein the court makes a determination of dangerousness and confinement versus SIST). As noted earlier, the actual time period for completion of such trials is approximately one year. (2008 OMH Annual Report at 14; 2009 OMH Annual Report at 13.)
The court thus finds, as did the Southern District of New York in MHLS-I and MHLS-II, that a substantial liberty interest is implicated by the operation of the mandatory confinement provisions of Mental Hygiene Law § 10.06 (k). Accordingly, respondent is entitled to due process as he faces loss of his liberty via the mandatory pretrial detention scheme of Mental Hygiene Law § 10.06 (k)[26] pending the completion of a sex offender civil management trial.
B. Mental Hygiene Law § 10.06 (k) Does Not Meet the Requisite Due Process
As set forth below, the court finds that, having weighed the three factors set forth in Mathews, Mental Hygiene Law § 10.06 (k) violates respondent’s due process rights.
1. Respondent’s Interest in Avoiding Mandatory Detention Pending Trial is Substantial
As to the first Mathews factor — the private interest that will be affected by the official action — the court finds that respondent has a strong liberty interest that is substantially affected by the mandatory pretrial confinement scheme of Mental Hygiene Law § 10.06 (k).
Respondent began civil confinement on or about January 23, 2011, approximately six months ago, when his term of criminal incarceration was complete. Although the court now has completed the probable cause hearing with respect to finding that respondent is a sex offender requiring civil management, no trial yet has been scheduled, and it is unlikely that such trial *344 even will be scheduled or started (let alone completed) within 60 days of the court’s probable cause finding.[27]
Thus, respondent has faced and continues to face a significant deprivation of his liberty in mandatory pretrial detention awaiting an adjudication of this sex offender civil management proceeding.
2. Respondent’s Risk of Erroneous Deprivation of Liberty is Great under Mental Hygiene Law § 10.06 (k) and There is Substantial Value in Adding Additional Procedural Safeguards.
The second Mathews factor requires the court to examine the risk of erroneous deprivation of the interest at stake as a result of the State’s procedures and the probable value, if any, of additional or substitute safeguards with respect to that interest. (Mathews at 334-335.) Here, the court finds that the risk of an erroneous deprivation of respondent’s liberty under article 10’s pretrial detention scheme is great.
(a) Respondent’s Deprivation of Liberty Awaiting Trial under Mental Hygiene Law § 10.06 (k) is Erroneous and is a Greater Consequence than He Would Face after a Trial
Mental Hygiene Law § 10.06 (k) mandates detention after a finding of probable cause until completion of the trial. Supreme Court precedent, set forth in Salerno, instructs that a person can be confined pending trial only if, along with a finding of probable cause, the state proves by clear and convincing evidence that there are no conditions of release that can reasonably assure the safety of the community or any person, before such person may be detained pending trial. (Salerno at 750.) Such precedent controls and the court is bound to follow it. (Matter of Hynes v Tomei, 92 NY2d 613, 629 [1998], cert denied 527 US 1015 [1999] [state courts are bound under the Federal Constitution to follow controlling Supreme Court precedent]; People v Cortes, 80 NY2d 201, 211 [1992] [trial court bound to follow existing precedent].)
Here, no such finding of dangerousness or the insufficiency of lesser conditions than confinement is required by, of even permitted by, Mental Hygiene Law § 10.06 (k).[28] Even if such *345 finding were required by the statute, no such finding can be made here.
The Attorney General presented no evidence that lesser conditions than confinement would not suffice to protect the safety of the public, either at the original hearing or the reopened hearing on the issue. Indeed, at the May 26, 2011 hearing, the only testimony elicited about respondent’s dangerousness was on direct examination and indicated only that the State’s expert considers respondent to be a danger if released because she lacked information about what would happen to respondent if he were to be released with supervision and/or treatment pending trial:
“Q : Based upon your overall evaluation of the respondent, do you believe that he would be a danger to the community if released pending trial?
“A: Yes, I do.
“Q: And why is that?
“A: Because at this time there is — we have no information regarding particulars; where Mr. [T.] will go for treatment, where he might reside if that in fact might be approved by Parole. There is a lengthy investigation that happens with respect to the strict and intensive supervision and treatment.” (Tr at 35.)
At the reopened hearing on June 13, 2011, no additional evidence was presented. Instead, the petitioner contended that since no lesser conditions than confinement are authorized by the statute, no lesser conditions than confinement can suffice and therefore it had met its burden of showing that respondent must remain confined pending trial.[29] (Tr No. 2 at 6-7, 9.)
Finding that a respondent is dangerous because there are no less restrictive conditions than confinement authorized under *346 the statute would render meaningless the constitutional requirement that a court must make such a finding before confining a person. (See Salerno at 750.) If that constituted sufficient “proof,” no such finding could meet the “specific” or “individualized” mandate of due process as such finding automatically would be made in every article 10 case.
In this court’s view, the Attorney General fell far short of showing (as required by Salerno) that respondent’s pretrial detention under article 10 meets constitutional muster in that the Attorney General has failed to show that no lesser conditions than confinement would suffice to protect the community if respondent were to be released pending trial. The fact that no lesser restrictions than confinement are authorized by statute is not the same as proving that no lesser conditions than confinement would suffice. (Indeed, as set forth in section V [C], infra, the statute is unconstitutional because of the very fact that it does not authorize any conditions less than confinement.)
Respondent’s current pretrial detention awaiting trial is more onerous than the consequences that respondent faces even if a jury were to find, after a trial, that he suffers from a mental abnormality. Civil confinement after such a jury finding cannot occur unless a court makes a finding, by clear and convincing evidence, that a respondent is a dangerous sex offender requiring civil confinement. There is very little likelihood, if any, of such a finding in this case in light of the recent OMH report, completed on July 14, 2011, that recommends that community-based treatment services are appropriate for respondent in this matter (the SIST Report).
Unfortunately, the court has no statutory authority to order respondent to be released pending trial under the conditions recommended in the SIST Report. Mental Hygiene Law § 10.06 (k) mandates confinement. Thus, respondent is faced with a *347 Morton’s Fork[30] — he must either choose to enforce his right to a jury trial and continue to be detained for an unknown period of time in a psychiatric facility awaiting trial on this matter or surrender his right to trial and consent to a finding of mental abnormality so that he may be immediately released back to the community under SIST.[31]
Due process cannot countenance a statute that mandates such a choice.
(b) Additional or Substitute Safeguards are Essential
Many New York courts as well as the federal court recognize that Mental Hygiene Law § 10.06 (k) is insufficient, as written, to fall within the constitutional requirements of the narrow pretrial detention exceptions to the liberty norm in our society. (See e.g. MHLS-II, 2011 WL 1344522 at *14-15, 2011 US Dist LEXIS 40434 at *48-50; P.H., 22 Misc 3d at 712.) Thus, additional safeguards are essential for the Legislature to convert the unconstitutional provisions of Mental Hygiene Law § 10.06 (k) into a statute that contains the requisite constitutional due process safeguards for pretrial detention.
Both federal and New York courts have recognized that the Mental Hygiene Law § 10.06 (k) pretrial detention provision *348 cannot be enforced if there is no individualized, specific finding of dangerousness and that lesser conditions than confinement would not suffice to protect the public. (See e.g. MHLS-I, 2007 WL 4115936 at *15, 2007 US Dist LEXIS 85163 at *50-54; MHLS-II, 2011 WL 1344522 at *14-15, 2011 US Dist LEXIS 40434 at *48-50; P.H., 22 Misc 3d at 712.) Such courts have required such findings or made such findings after probable cause proceedings in article 10 cases despite the language of Mental Hygiene Law § 10.06 (k).
Unfortunately, as set forth further herein, it is this court’s position that the findings mandated by the Southern District in MHLS-I and MHLS-II, as well as some of the New York courts, do not rehabilitate the unconstitutional mandatory pretrial detention scheme of Mental Hygiene Law § 10.06 (k) because there is no option to release a respondent if lesser conditions than confinement would suffice, and this court is not empowered to rewrite the statute to correct its unconstitutionality.
(c) The Government’s Interest in Protecting the Public is Important But Mental Hygiene Law § 10.06 (k) is Not Narrowly Tailored to Meet the Legislative Intent of Article 10
The third Mathews factor the court must weigh in evaluating the process that is due is the State’s interest in the procedures set forth in Mental Hygiene Law § 10.06 (k), including the fiscal and administrative burdens that would accompany additional safeguards. (Mathews at 334-335.)
As to this third Mathews factor, the court finds that the government, as evidenced by its legislative findings, has no interest in requiring all pretrial article 10 respondents to be detained upon a finding of probable cause that they are detained sex offenders requiring civil management.
There is no dispute that New York’s Legislature enacted article 10 to ensure that the public is protected from recidivist sex offenders. (Mental Hygiene Law § 10.01 [a].) Nonetheless, the legislative findings of article 10 expressly provide that the “danger to society [posed by recidivist sex offenders] should be addressed through comprehensive programs of treatment and management.” (Mental Hygiene Law § 10.01 [a].)
The legislative findings also provide that only “[i]n extreme cases, confinement of the most dangerous offenders will need to be extended by civil process in order to provide them such treatment and to protect the public from their recidivistic conduct.” (Mental Hygiene Law § 10.01 [b].) The Legislature also made *349 plain that for some sex offenders “it can be effective and appropriate to provide treatment in a regimen of strict and intensive outpatient supervision.” (Mental Hygiene Law § 10.01 [c].) Thus, the Legislature found that “civil commitment should be only one element in a range of responses to the need for treatment of sex offenders.” (Mental Hygiene Law § 10.01 [c].)
In addition, the definition of “sex offender requiring civil management” in article 10 makes an express distinction between a “dangerous sex offender requiring confinement,” and “a sex offender requiring strict and intensive supervision.” (Mental Hygiene Law § 10.03 [q]; compare also Mental Hygiene Law § 10.03 [e] [dangerous sex offender requiring confinement], and 10.03 [r] [sex offender requiring strict and intensive supervision].)
Notwithstanding the distinctions made by the Legislature between a dangerous sex offender requiring confinement and a sex offender requiring strict and intensive supervision, and the legislative determinations that only in “extreme cases” is civil confinement required, Mental Hygiene Law § 10.06 (k) makes no such distinctions for the purpose of pretrial detention, nor allows for such distinctions with respect to its mandatory detention provisions.
Mental Hygiene Law § 10.06 (k) turns these legislative determinations on their heads by mandating pretrial detention of all sex offenders — whether they meet the dangerousness criteria or not — upon a finding of probable cause that such respondents are sex offenders requiring civil management and by omission of any provisions for supervised release and community-based treatment for appropriate sex offenders pending trial. Thus, Mental Hygiene Law § 10.06 (k) does not advance the Legislature’s goals.[32]
Finally, with respect to this third Mathews factor, the court notes that the State’s fiscal and administrative burden would be *350 substantially decreased if the mandatory detention scheme of Mental Hygiene Law § 10.06 (k) were modified to only require detention of those persons who could not be sáfely mantained in the community under conditions less restrictive than confinement such as supervision, treatment and/or medication.[33]
In addition, the administrative framework for a plan of pretrial release under article 10 already exists in the post-trial release provisions of the statute and would not be unduly burdensome for the State to effectuate. (See e.g. Mental Hygiene Law § 10.11 [a].) Article 10 already provides for numerous conditions which may be imposed, after a determination of mental abnormality by a jury, upon a respondent’s release to keep the Community safe. (Mental Hygiene Law § 10.11 [a].) After a finding of mental abnormality, a regimen of SIST may be imposed which is based upon supervision requirements recommended by the Division of Parole. These supervision requirements can include electronic monitoring, global positioning satellite tracking, polygraph monitoring, prohibition of contact with past victims, specification of residence or type of residence, and strict and intensive supervision by a parole officer. (Mental Hygiene Law § 10.11 [a] [1].) In addition, a specific course of sexual offender treatment will be recommended for a respondent. (Mental Hygiene Law § 10.11 [á] [1].) The same statutory release scheme under article 10 that currently is applied to respondents post-trial could be applied to such respondents who are pending trial after a finding of probable cause.
Thus, this court concludes that the government interest in protecting the public as set forth in the legislative findings of Mental Hygiene Law § 10.01 is not effectuated by the broad mandatory detention provisions of Mental Hygiene Law § 10.06 (k), and there is significant fiscal value and very small burden to the State if it were to modify the statute to safeguard the pretrial detention due process rights of respondents.
*351 C. Section 10.06 (k) is Unconstitutional on Its Face as It Violates Respondent’s Due Process Rights
In analyzing the constitutionality of Mental Hygiene Law § 10.06 (k), the court has been careful not to [11] ‘minimize the importance and fundamental’ nature of the individual’s right to liberty” (Foucha at 80, quoting Salerno at 750), yet mindful that a determination that a statute is facially invalid is a last resort — made only when there are no circumstances, no reading of the statute, under which the provisions of the statute are valid. (Salerno, 481 US at 739.)
Indeed, this court recognizes that, as a court of original jurisdiction, it must not set aside a legislative act as unconstitutional unless such a finding is inescapable. (Comiskey v Arlen, 55 AD2d 304, 307 [2d Dept 1976]; People v Alexis, 14 Misc 3d 978, 980 [Sup Ct, Kings County 2007]; see also McKinney’s Cons Laws of NY, Book 1, Statutes § 150.) In this case, the conclusion that section 10.06 (k) of article 10, as written, is unconstitutional on its face, is inescapable.
The mandatory pretrial confinement provisions of Mental Hygiene Law § 10.06 (k) upon a finding of probable cause cannot pass constitutional muster in light of Supreme Court precedent in Salerno and Foucha. The Southern District in both MHLS-I and MHLS-II[34] already has found Mental Hygiene Law § 10.06 (k) to be facially unconstitutional. For all of the reasons set forth supra, this court concurs with those findings.
1. Mental Hygiene Law § 10.06 (k) is Clear and Unequivocal Regarding Confinement after a Finding of Probable Cause
The first rule of statutory construction is to give a statute its plain meaning. (See McKinney’s Cons Laws of NY, Book 1, Statutes § 94; Matter of Ramroop v Flexo-Craft Print., Inc., 11 NY3d 160, 166 [2008] [“starting point in any case of interpretation must always be the language itself, giving effect to the plain meaning thereof”], quoting Majewski v Broadalbin-Perth Cent. School Dist., 91 NY2d 577, 583 [1998].) The plain meaning of Mental Hygiene Law § 10.06 (k) is that a respondent *352 must be confined through the pendency of a trial after a finding that there is probable cause to believe such person is a sex offender requiring civil management.[35] There is no option for release of a respondent with supervision if lesser conditions than confinement would suffice.
Although some New York courts have interpreted Mental Hygiene Law § 10.06 (k) to mean that the Legislature implicitly required both a finding of probable cause that a respondent is a sex offender requiring civil management and probable cause to believe that a respondent is dangerous and that lesser conditions than confinement would not suffice (see e.g. J.J. at 203-204; C.B.), the plain language of the statute does not say this.[36]
Irrespective of whether there is a finding of dangerousness or if lesser conditions than confinement would suffice to protect the public, the statute requires that, upon a finding of probable cause to believe that respondent is a sex offender requiring civil management, he must be confined under the statute through the pendency of the trial.
2. The Court Cannot Amend Mental Hygiene Law § 10.06 (k) So That it Meets Constitutional Muster
In construing statutes, it is well established that where a statute is clear and explicit in its language, omissions cannot be *353 supplied by construction. (See Matter of Consolidated Mut. Ins. Co. [Arcade Cleaning Contrs.—Superintendent of Ins.], 60 NY2d 1, 12 [1983] [a legislative omission in the Insurance Law should not be supplied by court]; People v Kupprat, 6 NY2d 88, 90 [1959] [upholding criminal conviction prohibiting Sunday sales — “(w)e must read statutes as . . . written and, if the consequence seems unwise, unreasonable or undesirable, the argument for change is to be addressed to the Legislature, not to the courts”]; Eastern Paralyzed Veterans Assn. v Metropolitan Transp. Auth., 79 AD2d 516 [1st Dept 1980] [court should not fill up or cure a cause omissus by supplying what it thinks should have been put there by lawmakers]; Matter of Wilson v Dorflinger & Sons, 218 NY 84, 86 [1916] [courts’ duty is to interpret statute without reference to whether its provisions are wise or unwise]; McKinney’s Cons Laws of NY, Book 1, Statutes § 73, Comment, at 149-150 [courts “may not, by interpretation, add to or take from a clear and positive legislative mandate, or substitute that which must be brought into existence by legislative expression”].)
The mandatory confinement provision of Mental Hygiene Law § 10.06 (k) fails to require the individualized and specific determination of dangerousness that the Constitution requires. (See Salerno, 481 US at 751; MHLS-II, 2011 WL 1344522 at *11, 2011 US Dist LEXIS 40434 at *40.) It is not for this court to conform the provision to the constitutional requirements by rewriting it.
Nonetheless, many New York courts, adopting the language articulated by the federal court in MHLS-I and MHLS-II — that a respondent is dangerous and that no lesser conditions than confinement would suffice to protect the public — have made such findings and civilly confined respondents pending trial, thus avoiding a finding that that portion of Mental Hygiene Law § 10.06 (k) is facially unconstitutional. (See P.H., 22 Misc 3d at 712; C.B., 2008 NY Slip Op 50488[U] at *4.)
Even if the court were to determine that the Legislature implicitly intended such a required determination, as set forth in section V (B) (2) (a) (supra), no such finding can be made in this case. And, neither Mental Hygiene Law § 10.06 (k) nor any other provision of article 10 provides for pretrial release of a respondent when a court finds, as here, that the Attorney General has not established that lesser conditions than confinement would not suffice.
Thus, the court finds that the mandatory confinement provisions of Mental Hygiene Law § 10.06 (k) are unconstitutional in *354 that they lack the requisite due process protections mandated by Salerno and Foucha; even if the court were to construe the statute to require the findings specified in Salerno, no such findings could be made in this case. As the court has no power to rewrite the statute to allow respondent to be released under supervision and treatment pending trial, the court declares those provisions of Mental Hygiene Law § 10.06 (k) unconstitutional.
VI. Conclusion
For all of the foregoing reasons, this court has determined that the aforementioned provisions of Mental Hygiene Law § 10.06 (k) are unconstitutional. Accordingly, the court is constrained to order respondent’s release forthwith. Notwithstanding the foregoing, the court stays this order for 10 days to allow the parties to seek any appropriate relief they deem necessary.
Moreover, although the court is not statutorily empowered to order pretrial supervision and treatment of respondent, the court notes that the parties may agree to any such terms and conditions, pending trial, as they deem fit.

. See decision on probable cause hearing (31 Misc 3d 1237[A], 2011 NY Slip Op 51027[U] [June 7, 2011]), incorporated herein as if set forth in full.

. Shortly after the probable cause hearing, the court became aware that the United States District Court for the Southern District of New York (Southern District), in an action entitled Mental Hygiene Legal Serv. v Cuomo (2011 WL 1344522, 2011 US Dist LEXIS 40434 [Mar. 29, 2011] [previously captioned Mental Hygiene Legal Serv. v Spitzer (2007 WL 4115936, 2007 US Dist LEXIS 85163 [SD NY, Nov. 16, 2007])]), found Mental Hygiene Law § 10.06 (k) to be unconstitutional. In an order issued in that action and consented to by the Attorney General, the Southern District enjoined the Attorney General from seeking to enforce Mental Hygiene Law § 10.06 (k) in any sex offender civil management proceedings unless the Attorney General made a showing of dangerousness and that no lesser conditions of supervision would suffice to protect the public. At the probable cause hearing, the Attorney General did not seek such a finding by the court. (See tr at 76; transcript of reopened hearing, dated June 13, 2011, at 6 [court initiated discussion on issue].)

. See section IV (A), infra, for a detailed discussion of Salerno.

. See Office of Mental Health, Multiple Service Community Treatment Plan Pursuant to 10.11 (a), at 1 (July 14, 2011) (SIST Report) (“OHM recommends the following course of community based treatment . . . Based on *323 [respondent’s] needs, it is appropriate that he be recommended for community based treatment services”).

. This court’s decision on probable cause hearing in this case (31 Misc 3d 1237[A], 2011 NY Slip Op 51027[U] [2011]) also contains a detailed discussion of the procedural history of respondent’s criminal conviction out of which the civil management petition arose. That decision is incorporated herein by reference as if set forth in full.

. “Mental abnormality” is defined as “a congenital or acquired condition, disease or disorder that affects the emotional, cognitive, or volitional capacity of a person in a manner that predisposes him or her to the commission of conduct constituting a sex offense and that results in that person having serious difficulty in controlling such conduct.” (Mental Hygiene Law § 10.03 [i].)

. Pursuant to Mental Hygiene Law § 10.06 (g), the probable cause hearing shall be held “[w]ithin thirty days after the sex offender civil management petition is filed, or within such longer period as to which the respondent may consent.” If a respondent had been at liberty when the petition was filed, the court is required to order respondent’s return to confinement, observation, commitment, recommitment or retention, as applicable, for the purposes of the probable cause hearing which shall commence no later than 72 hours from the date of the respondent’s return. (Mental Hygiene Law § 10.06 [h].) If respondent is anticipating release prior to the probable cause hearing, the court shall order the stay of such release pending the probable cause hearing and such hearing shall commence no later than 72 hours from the date of respondent’s anticipated release date. (Mental Hygiene Law § 10.06 [h].)

. As noted in footnotes 17 and 21, infra, that 60-day time period for commencement of the trial often extends well beyond 60 days; indeed, in a significant number of cases, pretrial confinement can last closer to one year.

. Pursuant to Penal Law § 130.91, which was enacted as part of the SOMTA statute and applies to crimes committed on or after April 13, 2007, a sexually motivated felony is defined as certain designated felony offenses, such as assault, gang assault, burglary, or robbery, among others, if such crime is committed “for the purpose, in whole or substantial part, of. . . direct sexual gratification.” (Penal Law § 130.91 [1].)

. Although not an issue in this case, the requirement that a person who committed a non-sex crime could be subject to the strictures of article 10 and civilly detained pending a determination by a jury as to whether the crime, by clear and convincing evidence, was sexually motivated highlights the onerousness of Mental Hygiene Law § 10.06 (k). At any probable cause hearing in such a case, the court typically need find only “probable cause” that such crime was sexually motivated. (See e.g. State of New York v Nelson, 30 Misc 3d 715, 717 [Sup Ct, NY County 2010].)
Under such a scenario, a person who was convicted of a robbery and had completed his or her sentence still would be civilly confined, pursuant to section 10.06 (k), pending the conclusion of a trial, until the jury determined whether or not the crime was “sexually motivated.”

. See 521 US at 351 (legislature’s finding that “sexually violent predators’ likelihood of engaging in repeat acts of predatory sexual violence is high” and “[a]s a result, the Legislature found it necessary to establish” a civil management procedure).

. The importance given by Justice Kennedy to treatment programs in upholding the constitutionality of the Kansas statute is notable in light of the dearth of evidence showing the effectiveness of any such programs with respect to recidivism. (Hendricks, 521 US at 371 [concurring] [“If the object or purpose of the Kansas law had been to provide treatment but the treatment provisions were adopted as a sham or mere pretext, there would have been an indication of the forbidden purpose to punish”]; see also Charles Patrick Ewing, Justice Perverted: Sex Offense Law, Psychology, and Public Policy, at 48-56 [Oxford University Press 2011].)
Notably, in the context of Mental Hygiene Law § 10.06 (k), pretrial treatment of sex offenders awaiting an article 10 civil management trial has been determined to be wholly unproductive by the agency that provides such treatment. (Office of Mental Health, 2008 Annual Report on the Implementation of Mental Hygiene Article 10, at 14 [Jan. 2009] [2008 OMH Annual Report].) OMH reported that at least 75% of the detained pretrial respondents do not participate in sex offender treatment and the lack of their participation is “disruptive to the treatment groups.” (Id.)
In 2008, OMH recommended that “[g]iven the high cost of secure treatment and the low treatment participation rate of pre-trial Article 10 respondents, the State should seek an alternative means of retaining control over this population without expending scarce treatment resources and disrupting the treatment of the adjudicated Article 10 population.” (Id.) OMH repeated these concerns in its 2009 annual report. (See Office of Mental Health, 2009 Annual Report on the Implementation of Mental Hygiene Law Article 10, at 18 [Feb. 2010] [2009 OHM Annual Report].) As of this writing, the 2010 annual report of OMH was not available.

. When a government act which deprives a person of life, liberty or property survives substantive due process scrutiny, the act must still be implemented in a fair manner — to wit, it must meet “procedural due process” requirements as well. (Mathews v Eldridge, 424 US 319, 335 [1976].)

. With respect to the equal protection violation, the Eastern District of North Carolina found, upon a rational basis analysis, that the government had not articulated any basis, let alone a rational one, for applying the strictures of sex offender civil confinement to imprisoned persons under the government’s police authority versus sexually dangerous individuals who are not under the government’s power. (2011 WL 2610566 at *6-7, 2011 US Dist LEXIS 71318 at *19.) The federal court rejected the argument that the federal government’s limited police power was an appropriate rationale for the Act’s limited reach to only those persons in federal custody. (Id.) The court found that there was no rational relationship between the Act’s distinction of persons *334 inside and outside federal custody with the legislative purpose of shielding the public from the dangers of sexual predation. (Id.) The court noted that the “federal government cannot use its limited powers as a justification for assaulting the Bill of Rights,” and that “[i]f the federal government does not have the power to equally apply its civil commitment scheme to everyone, then it should not civilly commit anyone.” (2011 WL 2610566 at *6, 2011 US Dist LEXIS 71318 at *18.) The court held that the disparate treatment of a respondent under the Adam Walsh Act with respect to commitment versus another person who is civilly committed due to mental illness was an equal protection violation. (2011 WL 2610566 at *6, 2011 US Dist LEXIS 71318 at *19.) The court cited to United States Supreme Court precedent in Humphrey v Cady (405 US 504, 512 [1972]) as well as Jackson v Indiana (406 US 715, 729 [1972]), in finding that equal protection rights are implicated where an individual receives different, or lesser, procedural protections based on his status as a sex offender.
This court notes that in May of this year, the Third Department in Matter of State of New York v Myron P. (86 AD3d 26, 30-31 [2011]) rejected a respondent’s contention that his equal protection rights under the US Constitution have been violated because of the differences between the right to a jury determination under article 9 of the Mental Hygiene Law and article 10 of the Mental Hygiene Law (which provides for no jury determination for confinement). In that case, the respondent, who was nearing the end of his six-year prison sentence, was involuntarily placed in a psychiatric facility. Respondent challenged the placement pursuant to Mental Hygiene Law § 9.31 (confined person entitled to hearing within five days of request), but, before the court held the requisite article 9 hearing, the Attorney General commenced an article 10 proceeding against respondent. (86 AD3d at 28.) The trial court denied respondent’s motion to stay the article 10 trial pending the article 9 hearing and subsequently a jury found “mental abnormality” pursuant to article 10. The respondent appealed the dispositional phase of the proceeding where a judge found that respondent required civil confinement. (Id.)
There, the Third Department determined that the Legislature’s intent that civil commitment of sex offenders should be implemented in a way that does not divert needed treatment resources, stigmatize or endanger traditional mental health patients who have different treatment needs and vulnerabilities than sex offenders was a sufficient rationale for disparate treatment of sex offenders and mentally ill persons. (86 AD3d at 31.)
Notably, although the Third Department articulated a rational basis for a different mental health treatment modality for sex offenders than for mentally ill persons, it did not articulate a rational basis for different due process treatment for sex offenders than for mentally ill persons. (See Humphrey v Cady, 405 US 504, 512 [1972] [equal protection rights are implicated where an individual receives different, or lesser, procedural protections based on his status as a sex offender].)

. The Southern District did not articulate all of the differences between the legislation at issue in Salerno — the Federal Bail Reform Act — and Mental Hygiene Law § 10.06 (k) at issue before it. In Salerno, the Supreme Court noted that the legislation expressly included the procedural due process safeguards in its pretrial detention provisions, i.e., probable cause hearing as to crime and then, if probable cause is found, full adversary hearing, on clear and convincing evidence by the government, that no restrictions less than pretrial confinement suffice to protect the community. (481 US at 751-752.) No such language exists in Mental Hygiene Law § 10.06 (k). Moreover, in Salerno, the standard of proof for confinement after a finding of probable cause is clear and convincing evidence in a full adversarial proceeding that no lesser restrictions would suffice to protect the community. (481 US at 751-752.) That standard of proof is not addressed in MHLS-I with respect to the necessary findings required for pretrial detention in an article 10 proceeding.

. Pursuant to section 10.06 (h), a court shall order a respondent who already has been released from incarceration to be returned to detention for the probable cause hearing (which hearing must be held within 72 hours after such return), or, for a respondent who is nearing a release date from incarceration, the detention of such respondent for the probable cause hearing (which *337 hearing must be held within 72 hours from the time in which the respondent would have been released from detention).

. Pursuant to the 2008 OMH Annual Report, an “estimated [50%] of the cases are disposed within 210 days of the probable cause determination.” (At 14.) The 2009 OMH Annual Report reported that “fewer than 60% of the [article 10] cases were disposed of within one year of the probable cause determination.” (At 13.)

. The United States Court of Appeals for the Second Circuit affirmed the Southern District’s decision preliminarily enjoining enforcement of Mental Hygiene Law § 10.06 (k). (Mental Hygiene Legal Servs. v Paterson, 2009 WL 579445, 2009 US App LEXIS 4942 [2009].) The Second Circuit agreed with the Southern District that the plaintiff had shown irreparable injury and a likelihood of prevailing on the constitutional claims regarding Mental Hygiene Law § 10.06 (k). (2009 WL 579445 at *2, 2009 US App LEXIS 4942 at *3-4.)

. The Southern District also found Mental Hygiene Law § 10.07 (c) and (d) to be unconstitutional and enjoined the Attorney General from enforcing their provisions. (MHLS-II, 2011 WL 1344522 at *15-17, 2011 US Dist LEXIS 40434 at *50-54.)

. Despite declaring Mental Hygiene Law § 10.06 (k) facially invalid, following its decision in MHLS-II, the Southern District issued a permanent injunction and order, enjoining the Attorney General from seeking to detain any article 10 respondent pending trial, pursuant to Mental Hygiene Law § 10.06 (k) “in the absence of a specific, individualized judicial finding of probable cause to believe that the person is sufficiently dangerous to require confinement, and that lesser conditions of supervision will not suffice to protect the public during the pendency of the proceedings.” (Permanent injunction order H 3.)

. Notably, approximately one year after that probable cause hearing where the court found that no lesser conditions exist to protect the public, that same respondent who had been confined pretrial, after having been so confined for at least one year, consented to a finding of mental abnormality and was released, pursuant to a consent disposition by the parties, to SIST. *340 (See Matter of State of New York v P.H., 31 Misc 3d 1227[A], 2011 NY Slip Op 50885[U], *2 [Sup Ct, NY County 2011].)

. Even after a jury finding of mental abnormality, a detained sex offender who suffers from that mental abnormality cannot be civilly confined unless a court determines, by clear and convincing evidence, that such person is a “dangerous sex offender requiring confinement,” which is defined as
“a person who is a detained sex offender suffering from a mental abnormality involving such a strong predisposition to commit sex offenses, and such an inability to control behavior, that the person is likely to be a danger to others and to commit sex offenses if not confined to a secure treatment facility.” (Mental Hygiene Law § 10.03 [e] [emphasis added].)

. “[T]here is no separate finding of ‘dangerousness’ required in the probable cause phase in article 10 as it is presently written. However, should the Legislature choose to add such a provision, this court will consider this issue so that this matter will not have to be relitigated.” (19 Misc 3d at 416.)

. “[F]or the same reasons enumerated by the Brooks court, this court has separately considered the issue of dangerousness.” (2009 NY Slip Op 50256[U] at *3.) Notably, in Sanchez, the court did not specifically address what facts established that a “lesser condition of supervision would not suffice” and does not address that prong of the MHLS-I analysis in its discussion of “dangerousness.”
Moreover, although Sanchez purported to adopt the rationale set forth in Brooks to make the specific finding that the respondent in that case was dangerous and that lesser conditions than confinement would not suffice, the Sanchez court explicitly rejected the statutory construction analysis undertaken by the court in Brooks and held that the finding by the Brooks court that a “separate and distinct finding of dangerousness is somehow implicit in the probable cause phase of Article 10 . . . amount[s] to a blatant disregard of a basic rule of statutory construction, which is to give a statute its plain meaning.” (Id., citing McKinney’s Cons Laws of NY, Book 1, Statutes § 94.)

. The J.J. court does not reconcile its “rules of construction” analysis with the language of Mental Hygiene Law § 10.06 (k) which mandates confinement of a respondent after a finding of probable cause or dismissal of the petition and release of respondent if the court does not find probable cause. Under a logical application of the J.J. “rules of construction” analysis, if a court did not find that probable cause was established as to both dangerousness and that lesser restrictions wouldn’t suffice, presumably a respondent would have to be released and the petition dismissed. (See Mental Hygiene Law § 10.06 [k] [“If the court determines that probable cause has not been established, the court shall issue an order dismissing the petition, and the respondent’s release shall be in accordance with other applicable provisions of law”].)
Such a result clearly would be contrary to the Legislature’s stated intent to protect the public by ensuring that individuals convicted of sex offenses receive supervision and treatment necessary to protect the public against the respondent’s recidivism. (Mental Hygiene Law § 10.01 [c].)

. Although Mental Hygiene Law § 10.06 (k) requires a court to order that the respondent be committed to a secure treatment facility designated by the Commissioner of the Office of Mental Health, a respondent (who has had a probable cause finding under article 10), who is still incarcerated by Department of Correctional Services (DOCS) under his criminal sentence, may provide written consent (with counsel), after his criminal sentence is completed, agreeing to remain in DOCS’s custody pending completion of the article 10 trial. (Mental Hygiene Law § 10.06 [k].) Such written consent may be revoked by a respondent at any time. (Id.)

. See footnotes 17 and 21 {supra).

. Although some New York courts have construed Mental Hygiene Law § 10.06 (k) to require a finding of dangerousness and that no lesser conditions *345 than confinement would suffice, as set forth in section V (B) (2) (b), infra, this court finds that no such construction of the statute is possible. And, even if the court were to construe Mental Hygiene Law § 10.06 (k) to contain such requirements, in this case no such finding can be made as lesser conditions than confinement would suffice to keep the public safe upon respondent’s release. (See SIST Report.)

. The position taken by the Attorney General in this case on this issue is of concern to the court — particularly in light of the permanent injunction and order, consented to by the Attorney General in MHLS-II, in which the Attorney General is enjoined from detaining any article 10 respondent pending trial in the absence of a specific, individualized judicial finding of probable *346 cause to believe that the person is sufficiently dangerous to require confinement and that lesser conditions of supervision will not suffice to protect the public during the pendency of the proceedings. (See permanent injunction order, MHLS-II, U 3.)
Although such federal order is not binding on this court (see People v Kin Kan, 78 NY2d 54, 60 [1991]), it certainly is binding on the Attorney General and the other parties to that federal action. The statute has not changed. Thus, the Attorney General’s position — that lesser conditions can never suffice because the statute does not authorize any lesser conditions than confinement — is disingenuous at best and points out the very reason why the statute is facially unconstitutional — the statute provides no option but confinement, no matter what the finding is with respect to dangerousness.

. A Morton’s Fork is a choice between two equally unpleasant alternatives with the same result. It is analogous to the expression “between a rock and a hard place.” The expression’s origin stems from a policy of tax collection in 1487, created by the Lord Chancellor of England, under King Henry VII, wherein if a subject lived in luxury and spent a lot of money on himself, he obviously had sufficient income to spare for the king. Alternatively, if the subject lived frugally and showed no sign of wealth, he must have substantial savings and could therefore afford to give it to the king. The arguments were the two prongs of the fork: irrespective of whether the subject was rich or poor, he had to pay taxes. (See also Burroughs v Metro-Goldwyn-Mayer, Inc., 683 F2d 610, 623 n 13 [1982].)

. In MHLS-I, the Southern District made note of the coercive effect of the automatic detention provisions of Mental Hygiene Law § 10.06 (k) holding that they
“operate ... as a hammer to coerce individuals to enter into plea arrangements with the State, and thereby accept both designation as a sex offender and intensive ongoing treatment in order to avoid spending what may be more than 60 days in involuntary confinement. A respondent as to whom post-trial detention is not sought will have an overwhelming incentive to agree to an adjudication that he is a sex offender in need of treatment, and to accept continuation of community supervision, rather than contest the State’s case, in order to avoid a potentially lengthy period of detention pending trial, even if he believes he may avoid any adverse consequence by going to trial.” (2007 WL 4115936 at *14, 2007 US Dist LEXIS 85163 at *50.)

. The Legislature, in enacting article 10, mandated that a court must find a high level of dangerousness before such court may order a respondent, who, after a jury trial, is found to suffer from a mental abnormality, to be confined to a secure treatment facility. (Mental Hygiene Law § 10.07 [f].) Specifically, article 10 requires a court to find, by clear and convincing evidence, that a respondent has “a mental abnormality involving such a strong predisposition to commit sex offenses, and such an inability to control behavior, that the respondent is likely to be a danger to others and to commit sex offenses if not confined to a secure treatment facility,” as a prerequisite to any such commitment. (Mental Hygiene Law § 10.7 [f].) Allowing a respondent to be detained upon any less showing prior to trial contravenes the Legislature’s intent.

. Each respondent detained in a secure facility in New York currently costs New York State taxpayers approximately $175,000 per year. (Gary Craig, Civil Confinement of Sex Offenders Costs State $175,000 Apiece, http:// www.democratandchronicle.com/article/20101226/NEWS01/12260311/Civilconfinement-of-sex-offenders-costs-state-175-000-apiece [DemocratandChronicle.com, Dec. 24, 2010].)
The annual cost to civilly confíne a sex offender in New York is the highest in the nation, and is more than four times the cost of criminal incarceration. (Id.) (Compare Texas’s cost of $17,391 for its program providing only outpatient treatment and supervision to New York’s cost of $175,000 for inpatient civil confinement — 10 times more.) (See also Ewing, Justice Perverted, at 63-64.)

. While the interpretation of section 10.06 (k) by the Southern District is not binding on this court, the analyses of section 10.06 (k) provided by that court in the MHLS-I and MHLS-II cases are instructive and compelling authority for this court’s consideration. (People v Kin Kan, 78 NY2d at 60 [analysis and resolution of federal constitutional question by the lower federal courts is not binding on New York courts, but does serve as useful and persuasive authority].)

. The New York cases (see e.g. Brooks and Sanchez), that reject the determination of MHLS-I that a specific finding of dangerousness is needed, do not examine Mental Hygiene Law § 10.06 (k) in terms of due process. For example, the Brooks court determined that the respondent suffered from a mental abnormality and that such a finding equates to a per se determination of dangerousness. (19 Misc 3d at 413.)
There, the court did not conduct a due process analysis as to pretrial detention; instead it presumed the Legislature had done so. The court concluded that “the Legislature intended that all those suffering from a mental abnormality have an inherent probability of dangerousness . . . which justifies their pretrial detention. It must rise to a substantially higher degree by clear and convincing evidence to justify posttrial confinement.” (Id. at 415.) The court held that its conclusion “is consistent with the constitutional procedural safeguards which [it] necessarily presume[s] the Legislature considered.” (Id.)
In both Brooks and Sanchez, although each court expressly rejected the need to make a specific finding of dangerousness and that lesser conditions than confinement would not suffice as set forth in MHLS-I, each court made such finding, nonetheless. Here, no such finding can be made.

. Some New York courts have rejected such a finding concluding that to hold that a “separate and distinct finding of dangerousness is somehow implicit” in the probable cause phase of article 10 “would amount to a blatant disregard of a basic rule of statutory construction, which is to give a statute its plain meaning.” (Sanchez, 2009 NY Slip Op 50256[U] at *3.)